UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

PAULETTE LASTER, individually and as
the personal representative of the Estate of
MYLES ELLIOT LASTER,

*Plaintiff,*

v.  **Case No.: 23-CV-1030**

CITY OF MILWAUKEE, BRANDON A. GATSON,
and TIMEKA R. PARKER,

*Defendants.*

**PLAINTIFF'S REPLY TO DEFENDANTS' BRIEF IN OPPOSITION TO**

**PLAINTIFF'S MOTION TO COMPEL DISCOVERY**

COMES NOW the Plaintiff, Paulette Laster, individually and as the personal representative of the Estate of Myles Elliot Laster, and respectfully submits this reply to this Honorable Court in support of her motion to compel the Defendant, City of Milwaukee, to fully comply with its discovery obligations, including the production of the Standard Operating Instructions (SOI) utilized by the Telecommunications Division of the Milwaukee Police Department (MPD).

# ARGUMENT

Under Federal Rule of Civil Procedure 26(b)(1), discovery includes any matter relevant to a party's claim or defense and proportional to the case's needs. The Standard Operating Instructions (SOI) used by the Telecommunications Division of the Milwaukee Police Department (MPD) fit this scope, relating directly to the Plaintiff's claims of negligence and procedural failures.

Defendants argue that the SOI are irrelevant, disproportional, and cumulative, while the Plaintiff disagrees, citing deposition testimonies that establish the significance of the SOI in the operations of the MPD during emergency 911 calls. The SOI details the duties and responsibilities of telecommunicators and dispatchers, essential for understanding whether the City's employees met the expected standards of care during the incident. Unlike the general Standard Operating Procedures (SOP), the SOI provides specific guidelines for the Telecommunications Division, making them crucial for assessing dispatcher conduct.

When producing documents, the responding party cannot attempt to hide a needle in a haystack by mingling responsive documents with large numbers of nonresponsive documents. (*Hagemeyer N. Am. v. Gateway Data Scis. Corp.*, 222 F.R.D. 594 (E.D. Wis. 2004)). Rule 26(b)(1) permits discovery of relevant, non-privileged matters that can lead to admissible evidence (*Tuszkiewicz v. Allen-Bradley Co., Inc.*, 172 F.R.D. 393 (E.D. Wis. 1997)). Evidence is relevant if it pertains to the subject matter of litigation (*Fairfield v. Waukesha County*, No. 23-CV-873-JPS (E.D. Wis. Apr. 16, 2024)). District courts have broad discretion in discovery matters, considering factors like relevance, need, breadth, time period, specificity, and burden (*Eclipse Serv. v. SolarCode LLC*, No. 22-CV-757-JPS (E.D. Wis. Jan. 4, 2023)). Rule 26(b)(1)

also supports discovering information relevant to a claim or defense (*Appleton Papers, Inc. v. Envtl. Prot. Agency*, 702 F.3d 1018 (7th Cir. 2012)).

The Plaintiff's request for the SOI is specific, relevant, and necessary to establish whether MPD's telecommunicators and dispatchers followed proper procedures and standards. The SOI are critical to evaluating the standard of care and whether it was met.

In Wisconsin, a negligence claim requires proving a duty of care, a breach of that duty, causation, and damages (*Lees v. Carthage Coll.*, 714 F.3d 516 (7th Cir. 2013); *Balistreri v. Richard E. Jacobs Group, Inc.*, 322 F. Supp. 2d 972 (E.D. Wis. 2004)). The SOI are essential in establishing the duty of care by outlining specific instructions and protocols for telecommunicators and dispatchers, relevant to handling emergency calls. Testimonies from Captain Annemarie Domurat and Nicholas Malcom highlight the SOI's importance in MPD's daily operations, indicating their relevance to the Plaintiff's negligence claims. (Malcom 22:2-22:18; 34:22-37:1, Attached hereto as Exh. A.), (Domurat 9:5-10:4, Attached hereto as Exh. B.).

Wisconsin law imposes a duty to avoid actions that unreasonably threaten others' safety (*Burton v. Am. Cyanamid Co.*, 441 F. Supp. 3d 705 (E.D. Wis. 2020)). The Plaintiff argues that the SOI are vital for identifying protocol deviations contributing to the delayed response to Mr. Laster's 911 calls. The SOI, therefore, are not irrelevant or cumulative; they offer specific insights that the SOP cannot.

Defendants' immunity argument under Wis. Stat. § 893.80(4) is challenged by exceptions to statutory immunity, particularly for ministerial acts, duties to address a known danger, actions involving professional discretion, and willful misconduct (*Estate of Williams v. City of Milwaukee*, 274 F. Supp. 3d 860 (E.D. Wis. 2017); *Estate of Fiebrink v. Armor Corr. Health*

*Servs., Inc.*, No. 18-CV-832-JPS (E.D. Wis. May 3, 2019)). The SOI may establish ministerial duties, making dispatchers' actions potentially outside discretionary immunity if they failed to follow mandated procedures.

The SOI are not cumulative but uniquely relevant and necessary for understanding the standard of care and procedural failures. They provide specific information not covered by other documents, essential for fair adjudication.

Furthermore, the cited case from the Defendant's reply, *Hoskins v. Dodge Cnty.*, does not support the Defendant's position as it pertains to general discretionary acts rather than the specific and detailed instructions contained in the SOI. In Hoskins, the court held that a 911 call describing a possibly sinking boat was insufficient to describe a known and present danger. However, the circumstances surrounding Mr. Laster's calls present a different context that warrants a closer examination of the dispatcher's adherence to the SOI.

Plaintiff has proposed reasonable measures to address concerns about sensitive SOI information, such as marking them "Attorney Eyes Only" or entering into a Protective Order with redactions. This approach aligns with standard civil litigation practices for handling sensitive discovery information (*Jeffery v. Sobek*, 22-cv-123-pp (E.D. Wis. Aug. 22, 2023); Federal Rule of Civil Procedure 26(c)).

**A. Plaintiff seeks an award of attorney's fees and costs incurred in bringing the motion and this reply**

Plaintiff seeks an award of attorney's fees and costs incurred in bringing the motion and this reply. The Defendants' obstruction has not only delayed the discovery process but has also necessitated additional legal expenses. The SOI are critical to the Plaintiff's case, providing essential information for establishing the standard of care and potential breaches. Therefore, the

Plaintiff respectfully reiterates her request for attorney's fees and costs incurred in bringing this motion, as provided by Federal Rule of Civil Procedure 37(a)(5). Awarding these fees and costs is both justified and necessary to ensure a fair and efficient resolution of this matter.

## CONCLUSION

For the ongoing reasons, Plaintiff respectfully petitions this Honorable Court to (1) compel the Defendant to comply with the Plaintiff's Motion to Compel and produce the Standard Operating Instructions and (2) grant Plaintiff the attorney fees and costs incurred in bringing this action. Such measures are essential to facilitate a just and efficient legal process, promote transparency, and uphold the principles of fairness in this case. Your favorable consideration of this request will significantly contribute to the expeditious and equitable resolution of this matter.

Dated this 15th day of July 2024.

**The LaMarr Firm, PLLC**

By: /s/ B'Ivory LaMarr
B'Ivory LaMarr, Bar No. 1122469
5718 Westheimer Rd., Suite 1000
Houston, TX 77057
Phone: (800) 679-4600 ext. 700
Email:blamarr@bivorylamarr.com
*Attorney for Plaintiff*

1  IN THE UNITED STATES DISTRICT COURT
2  EASTERN DISTRICT OF WISCONSIN
3  PAULETTE LASTER, Etc,
4      Plaintiff,
5  -vs-    CASE NO. 23-CV-1030
6  CITY OF MILWAUKEE, et al.,
7      Defendants.

- - - -

Deposition of NICHOLAS MALCOM, taken before Brian Kuebler, Notary Public, at 9:00 A.M. on Monday, May 6, 2024, pursuant to notice and/or stipulations of counsel, on behalf of the Plaintiff in this cause.

- - - -

JK REPORTING
WWW.JARKUB.COM
COURT REPORTERS

EXHIBIT A

```
 1        911 telecommunicator and a dispatcher?
 2   A.   They would be in the Standard Operating
 3        Instructions.
 4   Q.   Okay.  So just to clarify, that's not the
 5        Standard Operating Procedure of the City of
 6        Milwaukee Police Department, correct?
 7   A.   Correct.  That is correct.
 8   Q.   All right.  So what is a "Standard Operating
 9        Instruction"?
10   A.   It gives, like, the instructions for both job
11        positions, telecommunicator and dispatcher, and
12        it tells them how to go about basically their
13        daily duties.
14   Q.   Okay.  When do they get provided this SOP -- I
15        mean, I'm sorry, the Standard Operating Procedure
16        instructions?
17   A.   Yeah, SOI is provided to them as new employees in
18        week one.
19   Q.   Okay.  So just to be clear, so an individual
20        applies for 911 telecommunicator with the job
21        description that we just reviewed, and then it's
22        only after they've actually taken the job,
23        they've interviewed, they passed all the
24        requirements, and that's when there's sort of a
25        bait and switch where they're now provided a
```

```
 1   Q.  Okay.  So prior to 2019, you don't have any
 2       knowledge of any other consultants reviewing any
 3       of the materials that were provided?  Correct?
 4   A.  Correct.
 5                  MR. LAMARR:  All right.  At this
 6            time, I want to make an all-record request
 7            for discovery of the SOI that's been
 8            referenced in this deposition.
 9                  I don't believe that the Plaintiff
10            has received this SOI that's being
11            referenced.
12                  MR. HOTCHKISS:  Attorney LaMarr,
13            this is Attorney Hotchkiss, I'm
14            acknowledging that request.  Let me work on
15            it and get you an update, okay?
16                  MR. LaMarr:  Thank you.  And
17            again, I want the ver -- just to clarify,
18            I'm looking for the version that would have
19            been effective as of July of 2020.
20                  MR. HOTCHKISS:  Okay.  Understood.
21       BY MR. LAMARR:
22   Q.  Okay.  All right.  So just going back to the SOI
23       and the knowledge.  Seeing that you are the
24       representative of the City of Milwaukee Emergency
25       Communications division there's -- for all we
```

1      know there could have been any employee in the
2      emergency communications division that could have
3      created this SOI; is that fair?
4   A. Any employee?
5   Q. Yeah, any employee.
6   A. No.
7   Q. Okay. So --
8   A. It would --
9   Q. Go ahead.
10  A. It would have to be an employee, I could only say
11     associated with either Quality Assurance or
12     Training prior to 2016.
13  Q. "Quality Assurance" or "Training"?
14  A. Yeah. You can't just -- I mean, it has to go
15     through approvals. You can't just create
16     something and send it out, it has to be approved
17     by the division commander.
18  Q. Okay. Can you tell me who in 2020 approved the
19     SOI that was in place as of July 2020?
20  A. The SOI that was in place in July 2020 was the
21     one that was approved prior to 2016.
22  Q. Okay.
23  A. So like, there was probably some updates that
24     were done via memorandum, but it's not a document
25     that's just like published every year.

```
                                                                36
 1   Q.   Okay.  And who would've -- who approved it?
 2   A.   Initially?
 3   Q.   No, who approved the one that was in place as of
 4        July 2020?
 5   A.   That would've been whoever was the commander in
 6        2016.
 7   Q.   Okay.  So as you sit here today, you don't know
 8        who that person would be, correct?
 9   A.   Definitively no.
10   Q.   Okay.  Is it signed by individual?  Is the SOI
11        actually signed by individual at the bottom of
12        it?
13   A.   No.
14   Q.   Okay. All right.  And so it's not signed.  And
15        is there an approval process, that you're aware
16        of, that goes to state that this is an effective
17        way of managing the emergency communications
18        division?
19   A.   Did you say "to the state"?
20   Q.   No.  Is there any approval process or is it just
21        the individual that creates it and then makes it
22        the policy or the instruction?
23   A.   It's approved by the commander of the division.
24        Some of them go to the, like the chief's office,
25        but in -- I don't know who approved it in 2016,
```

1    no, I do not.
2  Q.  Okay.  So essentially as of that date,
3      individuals were operating off of a policy that
4      they don't know who approved it, correct?
5  A.  I wouldn't say that, no.  If it was disseminated,
6      it was at least approved by the commander of the
7      division.
8  Q.  Okay.  But you don't know who that individual
9      was, correct?
10 A.  Correct.
11 Q.  Was there any disciplinary procedure for not
12     following the SOI?
13 A.  Yes.
14 Q.  Okay.  And what was that disciplinary process?
15 A.  I mean, this is a -- discipline is outside of my
16     scope, but if you're in violation of something in
17     SOI, it is disciplinary, yes.
18 Q.  Okay.  And who issued that discipline?  Who was
19     the person responsible for issuing the
20     discipline?
21 A.  Disciplines are issued by the Internal Affairs
22     Division.
23 Q.  Internal Affairs.  So the Internal Affairs are
24     disciplining individuals for not following a
25     policy that's not even signed?

1      IN THE UNITED STATES DISTRICT COURT
2          EASTERN DISTRICT OF WISCONSIN
3   PAULETTE LASTER, Etc,
4              Plaintiff,
5      -vs-                    CASE NO. 23-CV-1030
6   CITY OF MILWAUKEE, et al.,
7              Defendants.
8
9                        - - - -
10
11     Deposition of ANNEMARIE DOMURAT, taken before
12  Brian Kuebler, Notary Public, at 11:30 A.M. on
13  Monday, May 6, 2024, pursuant to notice and/or
14  stipulations of counsel, on behalf of the
15  Plaintiffs in this cause.
16                       - - - -
17
                    JK REPORTING
18
                   WWW.JARKUB.COM
19
                   COURT REPORTERS
20
21
22
23
24                                          EXHIBIT
                                               B
25

1  A.  In February of this year, we set up a new CAD
2      system and that meant that we had to update the
3      SOI to indicate how priorities and things like
4      that had changed.
5  Q.  Okay. And just so I could understand the
6      Standard Operating Instruction, is that something
7      that is kind of created internally for that
8      office to kind of function?
9  A.  Yes, that is correct.
10 Q.  Okay. So it's not like a Standard Operating
11     Procedure that is publicized, something that, you
12     know, that is kind of voted on and amended and
13     memorandums go out in response to, this is
14     something that's kind of like an internal way of
15     doing things within that office; is that fair?
16 A.  That is fair. The difference between a Standard
17     Operating Procedure and SOI is that an SOI only
18     applies to one unit, whereas, you know, at MPD if
19     we have a Standard Operating Procedure that
20     applies to everyone.
21 Q.  Okay. All right. And you would agree that the
22     telecommunications division, it's a team effort
23     set up to accomplish one goal, correct?
24 A.  Correct.
25 Q.  And that goal would be specifically to manage the

| | | |
|---|---|---|
| 1 | | response of 911 calls, correct? |
| 2 | A. | To clarify, do you mean manage response as far as |
| 3 | | enter them and dispatch them? |
| 4 | Q. | Yes. |
| 5 | A. | Then yes. |
| 6 | Q. | Okay. Now as it relates to -- well, let me ask |
| 7 | | you this: Do you have any specific knowledge of |
| 8 | | the incident involving the Plaintiff in this |
| 9 | | case, Myles Laster, the Estate of? |
| 10 | A. | I'm aware that he was a victim of a homicide. |
| 11 | Q. | Okay. Do you know anything as far as how the |
| 12 | | Telecommunications Division responded to that |
| 13 | | incident? |
| 14 | A. | I have listened to the calls. |
| 15 | Q. | Okay. Beyond listening to the calls, did you |
| 16 | | review any of the CADs in that, in this -- |
| 17 | A. | I did not. |
| 18 | Q. | Okay. All right. And generally, you would agree |
| 19 | | that when a -- after someone takes the call at |
| 20 | | the TCD, that it should be dispatched promptly, |
| 21 | | correct? |
| 22 | A. | Depends on the priority. |
| 23 | Q. | Okay. If it's a Priority 1, 2, or 3, you would |
| 24 | | agree that those should be dispatched promptly, |
| 25 | | right? |