UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

**PAULETTE LASTER, individually and as
personal representative of the Estate of
Myles Laster,**

    Plaintiff,

  v.                                                              Case No. 23-CV-1030

**CITY OF MILWAUKEE,** *et al.*,

    Defendants.

---

### DECISION AND ORDER ON DEFENDANTS' MOTION
### FOR SUMMARY JUDGMENT

---

    This action arises from the murder of Myles Laster on July 1, 2020. Laster's mother, Paulette Laster, individually and as the personal representative of Laster's estate, brings this action against the City of Milwaukee and Emergency Communications Operators Brandon Gatson and Timeka Parker. Plaintiff alleges federal and state law causes of action, including negligence against the City of Milwaukee and substantive due process claims under the Fourteenth Amendment against Gatson and Parker. Defendants have moved for summary judgment on all claims. For the reasons explained below, defendants' motion for summary judgment (Docket # 39) is granted.

### FACTS

    On July 1, 2020, Laster and Kayla Klumpp were in a verbal altercation at a gas station near the intersection of 60th Street and Bradley Road in Milwaukee, Wisconsin in which Klumpp issued verbal threats, hit his vehicle, and fled the scene. Subsequent to this altercation, Laster made two 911 calls.

*First 911 Call with Gatson*

At 6:21 p.m., Laster called 911 and spoke with 911 telecommunicator Gatson, who created a Computer Aided Dispatch ("CAD"). The CAD program allows 911 telecommunicators to collect information and input assignments for police officers to respond to. (Deposition of Nicholas Malcom ("Malcolm Dep.") at 40–41, Docket # 45-6.) Once the information is entered by a telecommunicator, the information goes to dispatch. The dispatcher subsequently reviews the information to assess how many units should respond. (*Id.* at 42.)

Laster described the verbal altercation with Klumpp to Gatson. (Tr. of First 911 Call, Docket # 42-1.) Laster stated that he was in a gas station near 60th and Bradley when he encountered a woman he knew as Klumpp. (*Id.* at 2.) Laster told Gatson that Klumpp's boyfriend recently passed away and he asked her if she was okay. (*Id.* at 2.) According to Laster, Klumpp responded "fuck you, stop talking to me." (*Id.*) Klumpp then called Laster the "N-word" and said, "fuck you." (*Id.*) Laster further reported that Klumpp left the gas station but then attempted to reenter. Additionally, while outside the gas station, Laster said Klumpp then turned around saying "she will beat [his] ass and all this shit." (*Id.*) But Laster's brother, who was also present, prevented Klumpp from reentering the gas station. (*Id.* at 3.) Laster said he then proceeded to pump his gas and leave. (*Id.*) After leaving the gas station, Laster went to the nearby Quick Pantry. Laster stated that Klumpp hit his car and left the scene. (*Id.*)

When Gatson asked if he required medical attention, Laster said that his neck hurt, but he denied needing medical attention. (*Id.* at 3–4.) Gatson asked Laster for a description of Klumpp (i.e., white, Black, or Hispanic), her name, and what type of vehicle she was

2

driving; Gatson also asked Laster for his car's make, his first and last name, and his phone number. (*Id.* at 4–5.) Gatson asked Laster how long ago the incident happened. Laster stated the altercation happened within the last half hour. (*Id.* at 5.) Gatson told Laster that he entered the call for service and that officers would respond. (*Id.*) At 6:25 p.m., Gatson submitted the CAD noting threats of bodily harm. (Pl.'s Proposed Findings of Fact ("PPFOF") ¶ 1, Docket # 44 and Defs.' Response to PPFOF ("Defs.' Resp.") ¶ 1, Docket # 49.)

*Second 911 call with Parker*

At approximately 6:47 p.m., Laster called 911 a second time and spoke with Parker (Defs.' Proposed Findings of Fact ("DPFOF") ¶¶ 21–22, Docket # 41 and Pl.'s Resp. to DPFOF ("Pl.'s Resp.") ¶¶ 21–22, Docket # 44.) Laster reiterated the sequence of events and described the verbal altercation with Klumpp, this time adding that his brother told him to "chill" because Klumpp "looked like she [was] about to do some bullshit." (Tr. of Second 911 Call at 3, Docket # 42-2.) Laster also reported that after he came out of the Quick Pantry, he observed Klumpp "darting on 60th Street." (*Id.*) He then went to look at his car and observed that the bumper on the right side of his car had red paint and a broken taillight. (*Id.* at 3–4.)

Parker stated that she saw a call in for service to Laster and that an officer would respond when they become available. (*Id.* at 4.) Laster asked if the officer could come to his home to take his report. After learning Laster's home address was in Brown Deer, Parker told Laster that he would have to stay at his current location for officers to take the report. (*Id.* at 6.)

Within minutes of Laster's second 911 call, he was fatally shot by Darius Anderson and Eric Gibson, who had been contacted by Klumpp. (DPFOF ¶¶ 43–44 and Pl.'s Resp. ¶¶ 43–44.) Anderson and Gibson were charged and convicted for their respective roles in

3

Laster's death; Anderson of first-degree reckless homicide, use of a dangerous weapon as a party to a crime, in Milwaukee County Case No. 2020CF2457 (J. of Conv., Docket # 42-6) and Gibson of second-degree reckless homicide, use of a dangerous weapon, as a party to a crime and harboring/aiding a felon, in Milwaukee County Case No. 2020CF2458 (J. of Conv., Docket # 42-7).

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. The mere existence of some factual dispute does not defeat a summary judgment motion. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In evaluating a motion for summary judgment, the court must draw all inferences in a light most favorable to the nonmovant. *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, when the nonmovant is the party with the ultimate burden of proof at trial, that party retains its burden of producing evidence which would support a reasonable jury verdict. *Celotex Corp.*, 477 U.S. at 324. Evidence relied upon must be of a type that would be admissible at trial. *See Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009). To survive summary judgment, a party cannot rely on his pleadings and "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248. "In short, 'summary judgment is appropriate if, on the record as a whole, a rational trier of

fact could not find for the non-moving party.'" *Durkin v. Equifax Check Services, Inc.*, 406 F.3d 410, 414 (7th Cir. 2005) (citing *Turner v. J.V.D.B. & Assoc., Inc.*, 330 F.3d 991, 994 (7th Cir. 2003)).

## ANALYSIS

Plaintiff asserts defendants violated Laster's constitutional rights by (1) creating a dangerous situation they failed to protect him from and by (2) showing a reckless disregard for his life amounting to an abuse of power. (First Amended Compl., Docket # 1-2.) Defendants move for summary judgment arguing that Laster's substantive due process rights under the Fourteenth Amendment were not violated. (Defs.' Br. at 5–9, Docket # 40.) Defendants further argue that they are entitled to qualified immunity and not liable under Wisconsin law.

1. *State-Created Danger Exception*

The Due Process Clause of the Fourteenth Amendment provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." The Clause is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security. *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 195 (1989). In *DeShaney*, the Supreme Court found that "the Due Process Clause[] generally confer[s] no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual." *Id.* at 196. There are, however, two exceptions to *DeShaney*'s general rule. First, when the state has a "special relationship" with the person such as "when it has custody over a person, it must protect him because no alternate avenues of aid exist." *Doe v. Vill. of Arlington Heights*, 782 F.3d 911, 916 (7th Cir. 2015) (internal citation and quotation

omitted). And second, under the state-created danger exception, "liability exists when the state affirmatively places a particular individual in a position of danger the individual would not otherwise have faced." *Id.*

To recover under the state-created danger exception, a plaintiff must demonstrate that: (1) the state, by its affirmative acts, created or increased a danger faced by an individual; (2) the failure on the part of the state to protect an individual from such danger is the proximate cause of the injury to the individual; and (3) the state's failure to protect the individual must shock the conscience. *King ex rel. King v. E. St. Louis Sch. Dist. 189*, 496 F.3d 812, 817–18 (7th Cir. 2007). "The state-created danger exception is a narrow one." *Doe*, 782 F.3d at 917. And it "must not be interpreted so broadly as to erase the essential distinction between endangering and failing to protect and thus circumvent *DeShaney*'s general rule. When courts speak of the state's 'increasing' the danger of private violence, they mean the state did something that turned a potential danger into an actual one, rather than that it just stood by and did nothing to prevent private violence." *Id.* (internal quotation and citation omitted). Thus, the cases in which the Seventh Circuit has either found or suggested that liability attaches under the state-created danger exception are "rare and often egregious." *Id.*

Several cases illustrate the contours of the exception and the egregiousness of the state conduct contemplated by the exception. *See, e.g.*, *Reed v. Gardner*, 986 F.2d 1122 (7th Cir. 1993); *Monfils v. Taylor*, 165 F.3d 511 (7th Cir. 1998); *Buchanan-Moore v. Cnty. of Milwaukee*, 570 F.3d 824 (7th Cir. 2009). In *Reed*, police officers arrested the driver of a vehicle, leaving behind an obviously intoxicated passenger with the car keys. 986 F.2d at 1123. The intoxicated passenger caused a head-on collision approximately two hours later, killing a pregnant mother and injuring several others. *Id.* The court found that by "removing a safe

6

Case 2:23-cv-01030-NJ    Filed 09/11/25    Page 6 of 16    Document 50

driver from the road and not taking steps to prevent a dangerous driver from taking the wheel, the defendants arguably changed a safe situation into a dangerous one." *Id.* at 1127. The state intervention had "created the dangerous condition, a drunk driver on the road." *Id.* at 1126.

In *Monfils*, Monfils tipped off the police to a thief at his workplace in a recorded phone call to the police. He repeatedly begged the police not to release the tape to anyone because the thief was a violent person who would recognize his voice. He was assured it would not be released. The thief, however, requested a copy of the tape from the police, and a policeman who did not know about Monfils' fears gave it to him. The thief discovered that Monfils was the informant and killed him. 165 F.3d at 513–15. The court upheld a jury verdict for the plaintiff because Monfils was safe (or at least much safer) before the police released the tape, without which the thief would have been unlikely to identify the informant. By the act of releasing the tape, the police created the danger to Monfils. *Id.* at 518.

In contrast, *Buchanan-Moore* involved a mentally ill man, Sidney Gray, who committed a string of crimes landing him in and out of the Milwaukee County Jail. Many of his arrests stemmed from violent and assaultive attacks. 570 F.3d at 826. He was committed to the County Mental Health Complex numerous times and prescribed medications that were successful in reducing his assaultive behavior. *Id.* He would not, however, take his medications when left unsupervised, thus the County frequently contacted Gray's family members following his release. *Id.* In June 2006, Gray was detained by City police after swinging a golf club at bystanders. *Id.* At a civil commitment hearing, City police and County doctors testified that Gray posed an immediate threat to others because of his assaultive behavior. *Id.* The judge agreed and ordered Gray committed; however, less than a week later, the County released Gray with his medications, but without contacting his family. *Id.* The

7

next day, Gray was arrested for a home invasion and taken to the County jail. *Id.* Despite knowing that Gray's violent behavior could continue if he remained unmedicated, Gray was not given his prescribed medications. *Id.*

While in custody, the District Attorney's Office drafted a criminal trespass complaint that a City police officer signed. *Id.* While it was the task of the police to deliver the complaint to the court, this was not done, and Gray was released by the County on July 9, 2006. *Id.* Approximately one week later, Gray was again arrested by City police for invading an occupied home, placed in the County jail, was not administered his medication, and was released four days later. *Id.* This time, no charges were filed against Gray. *Id.*

Approximately two weeks later, Gray conducted another home invasion. A neighbor, Frank Moore, walked up to the lot line separating the homes when Gray emerged from the side door and shot Moore in the head, killing him. *Id.*

Representatives of Moore's estate argued the County violated Moore's civil rights by releasing Gray after a 72-hour confinement during which he was not administered his medications. *Id.* at 826–27. The court granted the County's motion to dismiss, reasoning that Moore was not a foreseeable victim. The district court found that "Gray's acquisition of a gun, and its use on an innocent bystander" was "unpredictable rather than legally foreseeable." *Id.* at 828. Thus, Gray's general propensity for criminal acts was "too remote a consequence of the County's actions" to be considered the proximate cause of Moore's death. *Id.* at 829.

Two central themes are apparent in these cases and similar ones falling under the state-created danger exception. First, the cases involve the state either placing a person in a situation in which he is endangered by other private actors or the state escalates a person's

situation from potential danger to actual danger. Second, the state's conduct which places the person in danger or escalates the person's danger is egregious, as to "shock the conscience."

 2. *Application to this Case*

  2.1  Affirmative Acts Creating or Increasing Danger

Plaintiff argues that defendants created or increased the danger to Laster by instructing him to remain at his location knowing he had been threatened. According to plaintiff, the danger Laster faced was obvious after Klumpp threatened to "beat his ass," called him a racial slur, and hit his vehicle. Plaintiff also relies on Laster's brother's statement that Klumpp "looked like she [was] about to do some bullshit." (Tr. of Second 911 Call at 3, Docket # 42-2.) Despite knowing this danger, plaintiff argues, Gatson and Parker "compell[ed]" Laster to remain at his location, "restrict[ing] his ability to seek safety" and "leaving him vulnerable to the violence that soon followed." (Pl.'s Br. in Opp. at 3, 5, Docket # 46.)

Drawing all reasonable inferences in the light most favorable to plaintiff, as I must, the evidence is insufficient for a reasonable jury to conclude defendants created or increased the danger to Laster. The crux of plaintiff's argument rests on Laster allegedly facing an ongoing threat and being directed to remain at the scene pending an officer's arrival. But the record is void of evidence suggesting that the two 911 telecommunicators, Gatson and Parker, were aware that Laster remained in danger. What the evidence shows is that the 911 telecommunicators knew that Laster reported being in a verbal altercation with Klumpp, a person he knew, in which she had used a racial slur against him and threatened to "beat his ass." They also knew that Laster reported that Klumpp had hit his car and fled the scene. From these facts, no reasonable jury could conclude that the 911 telecommunicators created or increased a danger to Laster. And Klumpp's use of a racial slur would not have alerted

Gatson and Parker or a reasonable 911 telecommunicator that Laster was in danger. Lobbing of racial slurs, especially during conflict, is all too common. Nor would Klumpp's threat to "beat his ass" or Laster's brother remarking that Klumpp was about to "do some bullshit" suggest imminent danger. This is so because when Laster spoke to both Gatson and Parker, he reported that Klumpp had already left the scene. And when he spoke to Gatson, he reported that the incident happened within the last half hour. Laster did not report an ongoing emergency or that he was under a threat of danger. And plaintiff does not dispute that neither Gatson nor Parker knew that Klumpp had contacted Anderson and Gibson. (Pl.'s Resp. ¶ 43.) As such, none of these facts, either alone or in combination, add up to Gatson and Parker knowing that Laster was in imminent danger, especially from two unknown individuals, uninvolved in the verbal altercation. Thus, plaintiff has not presented facts on which a reasonable jury could find that the state created or increased a danger to Laster.

2.2 Proximate Cause

Plaintiff also show fails to establish proximate cause. To establish proximate cause, the state-created danger must involve a foreseeable risk to a foreseeable class of persons. *First Midwest Bank Guardian of Estate of LaPorta v. City of Chicago*, 988 F.3d 978, 988–89 (7th Cir. 2021) (citing *Buchanan-Moore*, 570 F.3d at 828). In this case, given that Klumpp had left the scene, it was not foreseeable to Gatson and Parker that Laster was in danger. Plaintiff is correct that foreseeability does not require precise knowledge of the exact harm that will occur. But generalized risks do not suffice. *Reed*, 986 F.2d at 1127. The record is uncontroverted that Laster reported that Klumpp had left the scene. Gatson testified during his deposition that he did not consider Laster in danger since Klumpp left the scene. (Deposition of Brandon Gatson, ("Gatson Dep.") at 20, Docket # 45-3.) Parker similarly

10

testified that she did not consider Laster in danger since Klumpp left the scene, and that she would have alerted a supervisor if Laster's situation escalated to an ongoing threat. (Deposition of Timeka Parker ("Parker Dep.") at 37, Docket # 45-4.) Ultimately, Laster was not shot by Klumpp, who was involved in the verbal altercation and hit and run, but by two other men whom Klumpp called unbeknownst to Gatson and Parker. That a verbal altercation—even one involving a racial slur and a threat of injury—and a hit-and-run—even one involving damage to the vehicle and physical injury to the occupant—would result in a fatal shooting by two individuals who were not present for the initial interaction could not be predicted.

In addition to Gatson and Parker not foreseeing any danger to Laster, their roles in the chain of events were too attenuated from Laster's tragic death. While it is true that Parker directed Laster to wait at the scene for police to take his report, defendants did not control how fast police would respond to their service call. Recall, Gatson's and Parker's roles were to get the pertinent information from the caller. The audio and transcript of the 911 calls show they did just that. They obtained from Laster Klumpp's name and description, the make and models of the cars involved in the incident, the location and time of the incident, and whether Laster needed medical attention. (Tr. of First 911 Call at 3–5; Tr. of Second 911 Call at 3–4.) After obtaining the pertinent information, their job was to enter it into the CAD so it is available to the dispatcher. (Malcolm Dep. at 40–42.) They did this as well. It is then the dispatcher's job to communicate to the police squads and it is the squad's responsibility to, in turn, do their job. (*Id.* at 41.) Considering that any danger to Laster was unforeseeable to Gatson and Parker and that their roles in the chain of events were too attenuated from Laster's

11

tragic killing, no reasonable jury could conclude that Parker's request for Laster to remain at the scene was the proximate cause of Laster's death.

Plaintiff argues that Laster being shot within minutes of his second 911 call together with the nature of the harm clearly establish that the danger was both imminent and foreseeable. (Pl.'s Br. in Opp. at 9.) This argument is unsupported by the record. Laster said nothing in the second call that would indicate that he would be harmed or killed within minutes, imminently, or at all. Again, Laster reported a verbal altercation and hit and run that occurred within 30 minutes of the first call with Gatson. The unfortunate timing of Laster's killing does not satisfy proximate cause.

Plaintiff also argues that the 94-minute delay between Laster's calls and the eventual dispatch of officers demonstrate that defendants' deliberate disregard of their duties was the proximate cause of Laster's death. (Pl.'s Br. in Opp. at 6–9.) This too is unsupported by the record evidence. Again, this presumes that Laster had communicated, and that Gatson and Parker had knowledge, that he was in harm's way while waiting for responders. Reviewing the transcripts and hearing Laster describe the circumstances surrounding the incident does not indicate ongoing, continued, or imminent danger. Laster reported a verbal altercation and a hit and run where the person had fled the scene, not an ongoing threat.

### 2.3 Shock the Conscience

Finally, on this record, no reasonable jury could find that defendants' actions were so egregious as to shock the conscience. Plaintiff argues that defendants' conduct was conscience-shocking because they deliberately disregarded a known or obvious risk of injury and failed to meaningfully act to mitigate that risk. Plaintiff further argues that despite defendants' alleged awareness of danger, they (1) failed to provide status updates to Laster to

inform him of the delayed response times and (2) failed to escalate the situation to a supervisor after the delayed response continued, in accordance with standard operating procedures and policies.

Conscience-shocking conduct requires a culpable mentality, equivalent to deliberate indifference. *Estate of Her v. Hoeppner*, 939 F.3d 872, 876 (7th Cir. 2019) (citing *King*, 496 F.3d at 819). Plaintiff's argument rests on the notion that Laster faced imminent danger, that defendants were aware of it, and nevertheless failed to follow-up with Laster or alert a supervisor when response times were delayed. But the record lacks evidence that Klumpp posed an obvious danger that defendants knew of and deliberately disregarded. Gatson stated during his deposition that he did not consider Laster in danger since Klumpp left the scene. (Gatson Dep. at 20, Docket # 45-3.) Gatson also stated that telecommunicators do not typically follow-up with callers to provide status updates as their only responsibility is to submit the information to dispatch. (*Id.* at 51.) Parker similarly stated that she did not consider Laster in danger since Klumpp left the scene, and that she would have alerted a supervisor if Laster's situation escalated to an ongoing threat. (Parker Dep. at 37, Docket # 45-4.)

It is true that policy dictates that 911 telecommunicators are expected to inform callers experiencing delayed response times of the status of their call in order to reassess their needs (PPFOF ¶ 12 and Defs.' Resp. to PPFOF ¶ 12), but a failure to follow a departmental policy does not give rise to a constitutional violation, *see Scott v. Edinburg*, 346 F.3d 752, 760 (7th Cir. 2003) ("42 U.S.C. § 1983 protects plaintiffs from constitutional violations, not violations of state laws or, in this case, departmental regulations and police practices."). At most, mere inaction or the failure to adhere to departmental procedures amounts to negligence. But

13

negligence, or even gross negligence, does not support a substantive due process claim. *Slade v. Bd. of Sch. Dirs. of Cty. of Milwaukee*, 702 F.3d 1027, 1032 (7th Cir. 2012).

Plaintiff also points to the 94-minute delay between the first 911 call and the eventual arrival of officers as evincing deliberate indifference for Laster's life. (Pl.'s Br. in Opp. at 9–12.) But the delay is similarly deficient to find defendants liable for a constitutional violation where state action did not create the harm. *Sandage v. Bd. of Commr's of Vanderburgh Cnty.*, 548 F.3d 595, 599 (7th Cir. 2008) ("There is no federal constitutional right to be protected by the government against private violence in which the government is not complicit."); *Bowers v. DeVito*, 686 F.2d 616, 618 (7th Cir. 1982) ("The Constitution . . . does not require the federal government or the state to provide services, even so elementary a service as maintaining law and order."). As previously stated, defendants' conduct did not create or enhance the harm Laster faced.

Plaintiff frames much of its argument on what Gatson and Parker failed to do—failing to follow-up with Laster; failing to alert a supervisor of the delayed response times; and failing to ensure officers were timely dispatched. But inaction does not create constitutional liability absent the state's creation of danger and conscience-shocking conduct. Otherwise, every case involving the state's failure to act promptly to provide emergency services could be brought in federal court. In this case, Laster was fatally shot by private actors within minutes of his second 911 call. But no affirmative act by defendants placed Laster in a significantly worse position than he already faced. *Doe*, 782 F.3d at 917 (stating that in cases where courts have found liability under state-created danger exception, "the plaintiff was safe, or at least considerably safer, before the police acted than he or she was thereafter").

3. *Abuse of Power*

For similar reasons, plaintiff's argument that defendants' deliberate indifference amount to an abuse of power that violated Laster's constitutional rights fails. Plaintiff again hinges much of its argument on the contention that Gatson and Parker knew Laster faced an imminent danger that they recklessly disregarded. But the factual record lacks evidence supporting plaintiff's version of events. Klumpp left the scene, and there was no further indication of danger or any ongoing emergency. As such, there was no violation of Laster's constitutional rights.

4. *Qualified Immunity*

Because I find summary judgment is appropriate on the merits, I need not address defendants' qualified immunity arguments.

5. *Remand to State Court*

Without the Fourteenth Amendment claims, all that remains is plaintiff's state law claim. Plaintiff alleges that defendants were negligent by disregarding established protocols and failing to provide prompt assistance. (Amended Compl., Docket # 1-2.) I will follow the general rule by relinquishing jurisdiction over the supplemental state law claim and will remand the claim back to state court. *Al's Serv. Ctr. v. BP Prods N. Am., Inc.*, 599 F.3d 720, 727 (7th Cir. 2010) ("When all federal claims in a suit in federal court are dismissed before trial, the presumption is that the court will relinquish federal jurisdiction over any supplemental state-law claims, 28 U.S.C. § 1367(c)(3).") (internal citation omitted); *see also RWJ Management Co., Inc. v. BP Products North America, Inc.*, 672 F.3d 476 (7th Cir. 2012).

## CONCLUSION

This case is indisputably tragic. Nothing in this decision is intended to minimize the senseless murder of Myles Laster and his mother's grief. The Seventh Circuit has found, however, that the state-created danger exception is a narrow one, generally reserved for rare and egregious cases. Even drawing all reasonable inferences in the light most favorable to the plaintiff, the evidence is insufficient for a jury to conclude that the defendants placed Laster in danger or transformed his potential danger to actual danger, or that the defendants abused their power. Thus, defendants' motion for summary judgment as to the plaintiff's Fourteenth Amendment claims is granted. I decline to exercise supplemental jurisdiction over the plaintiff's pendent state law claims.

## ORDER

**NOW, THEREFORE, IT IS ORDERED** that defendants' motion for summary judgment (Docket # 39) is **GRANTED**. Plaintiff's Fourteenth Amendment claims (Count II and III) of the First Amended Complaint are dismissed. Plaintiff's state law claim (Count I) is remanded to Milwaukee County Circuit Court.

**IT IS FURTHER ORDERED** that the Clerk of Court will enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 11th day of September, 2025.

BY THE COURT

_____
NANCY JOSEPH
United States Magistrate Judge